# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARTY M. KOBER**
   **Plaintiff,**

  **v.**             **Case No. 25-C-1268**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration**
    **Defendant.**

---

## <u>DECISION AND ORDER</u>

Plaintiff Marty Kober applied for social security disability benefits, alleging that he could no longer work due to a heart impairment. The Administrative Law Judge (ALJ) assigned the case agreed the impairment was severe but concluded that plaintiff could still perform light work with additional climbing, postural, and environmental limitations. In this action for judicial review, plaintiff contends the ALJ failed to adequately explain why he accepted the opinions of the agency's medical consultants and erred in finding plaintiff's daily activities inconsistent with his allegations of disabling symptoms.

Plaintiff is right. The ALJ did not comply with the regulation applicable to medical opinions, 20 C.F.R § 404.1520c, which requires the adjudicator to explain how he considered the "supportability" and "consistency" of an opinion. The ALJ also cited a number of activities in support of his credibility finding without specifically explaining how those activities undermined plaintiff's claims about the severity and limiting effects of his symptoms.

But the court need not remand whenever an ALJ makes a mistake. See <u>Liapis v. Bisignano</u>, No. 24-3170, 2026 U.S. App. LEXIS 19667, at *2, 13 (7th Cir. July 6, 2026); <u>Karr</u>

v. Saul, 989 F.3d 508, 513 (7th Cir. 2021); McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011); Halsell v. Astrue, 357 Fed. Appx. 717, 723-24 (7th Cir. 2009); Reham T. v. Bisignano, No. 24 C 10011, 2026 U.S. Dist. LEXIS 69446, at *12 (N.D. Ill. Mar. 31, 2026). Because the ALJ's errors were harmless, and because the decision is otherwise supported by substantial evidence, I affirm the denial of plaintiff's application.

## I. FACTS AND BACKGROUND

### A.      Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in June 2023, alleging a disability onset date of November 15, 2021. (Tr. at 168.) The agency determined his "date last insured" (DLI) for purposes of collecting disability insurance benefits was June 30, 2022, meaning plaintiff had to establish disability between November 15, 2021 and June 30, 2022. (Tr. at 204.) Plaintiff alleged that he could no longer work due to a variety of physical and mental impairments, including coronary artery disease, chronic fatigue syndrome, insomnia, and anxiety.[1] (Tr. at 208, 266.)

The agency denied the application at the initial level (Tr. at 48, 91) based on the review of medical consultant Pat Chan, M.D., who found plaintiff capable of light work with no further limitations (Tr. at 46), and psychological consultant Jason Kocina, Psy.D., who found insufficient evidence of a mental impairment (Tr. at 45). Plaintiff requested reconsideration (Tr. at 100), but the agency maintained the denial (Tr. at 59, 102) based on the review of Leonard Comess, who found plaintiff capable of light work with occasional climbing of ramps/stairs, frequent balancing, and avoiding concentrated exposure to extreme hot/cold and pulmonary

---

[1]Plaintiff suffered a heart attack in September 2018, with placement of stents. He underwent repeat cardiac catheterization in December 2019 due to unstable angina. (Tr. at 678, 1194, 1359.) The ALJ's decision, summarized below, contains a detailed review of the medical evidence from around the relevant period.

2

irritants, and moderate exposure to hazards (Tr. at 55-56), and Annette De Paz, who found plaintiff's mental impairment non-severe (Tr. at 54). Plaintiff then requested a hearing before an ALJ. (Tr. at 109.)

**B.     Hearing**

On October 9, 2024, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also called a vocational expert (VE) to give testimony on jobs plaintiff might be able to do. (Tr. at 1653, 1656.)

At the outset of the hearing, the ALJ confirmed the relevant dates: alleged onset date of November 15, 2021, and DLI of June 30, 2022. (Tr. at 1656-57.) Plaintiff testified that he tried to return to work in early 2022 but could not perform his duties. (Tr. at 1658.) The ALJ noted that plaintiff made only about $893 during that time. (Tr. at 1658.) Plaintiff testified to past work as an asphalt plant operator, which involved doing maintenance work on machinery. (Tr. at 1658-59.) His last day of work was in November 2021. (Tr. at 1660.)

Focusing on the relevant period of November 2021 to June 2022, plaintiff testified that he lived in a house with his wife. His wife usually drove him to appointments, although he did drive at times. (Tr. at 1663.) He noted sleep problems affecting his reaction time. (Tr. at 1664.) Plaintiff testified that he did not do much during this period; he did not cut the grass or shovel snow, although on one occasion he borrowed a neighbor's UTV to plow. (Tr. at 1665.) He could prepare some meals, depending on how he felt. (Tr. at 1666.) He did not go out to visit friends or family. (Tr. at 1666.) Plaintiff testified that he frequently took Nitro during this time, almost every day (Tr. at 1667); he also wore Nitro patches (Tr. at 1664). His doctor had recently increased his medication. (Tr. at 1664.) Plaintiff also testified to difficulty sleeping during the relevant period due to anxiety. (Tr. at 1668.) He took medications to help with sleep. (Tr. at

3

1669.)

The VE classified plaintiff's past work as "maintenance mechanic helper," heavy generally, medium as plaintiff performed it, with an SVP of 4. (Tr. at 1673.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education and experience, limited to light work, never climbing ladders or scaffolds, occasionally climbing ramps or stairs, occasionally stooping, kneeling, crouching and crawling, frequently balancing, avoiding concentrated exposure to extreme temperatures, pulmonary irritants and poorly ventilated areas, avoiding moderate exposure to hazards, and able to understand, remember and carry out simple instructions. (Tr. at 1673-74.) The VE testified such a person could not perform plaintiff's past work but could do other jobs, such as sales attendant, counter attendant, and cashier II. (Tr. at 1674.) Reducing the exertional level to sedentary, with all of the other limitations, the person could work as a food and beverage order clerk, charge account clerk, and sorter. (Tr. at 1674-75.) A need for two additional 30-minute breaks, in addition to normal breaks, would be work preclusive (Tr. at 1675), as would two or more absences per month (Tr. at 1676). The VE indicated that employers tolerate 10% time off task and 12 absences per year. (Tr. at 1676.)

## C.     ALJ's Decision

On November 22, 2024, the ALJ issued an unfavorable decision. (Tr. at 60.) Following the familiar five-step evaluation process,[2] the ALJ determined at step one that plaintiff did not

---

[2]At step one, the ALJ asks whether the claimant worked at the level of substantial gainful activity during the relevant period. If not, then step two asks whether the claimant has a severe mental or physical impairment. If yes, then at step three the ALJ decides whether the claimant's condition meets or equals the severity of one of the presumptively disabling impairments listed in the regulations. If no Listing applies, then before proceeding to step four, the ALJ must ascertain the claimant's "residual functional capacity" (RFC)—the maximum work that someone

4

engage in substantial gainful activity between the alleged onset date of November 15, 2021, and the date last insured of June 30, 2022. (Tr. at 65.) At step two, the ALJ found that plaintiff had the severe impairments of peripheral vascular disease, coronary artery disease, status post stent, hypertension, angina pectoris, chronic fatigue syndrome, and abdominal aortic artherosclerosis. (Tr. at 65.) The ALJ found plaintiff's alleged mental impairments non-severe. Specifically, he found no limitation in the areas of understanding, remembering or applying information, interacting with others, and adapting or managing oneself, and mild limitation in concentrating, persisting or maintaining pace. (Tr. at 66.) At step three, the ALJ determined that none of plaintiff's impairments met or equaled a Listing. (Tr. at 67.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform light work, except he could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch and crawl, and frequently balance; should avoid concentrated exposure to extreme cold and heat, pulmonary irritants such as fumes, odors, dust and gases, and exposure to poorly ventilated areas; should avoid even moderate exposure to hazards such as moving machinery and unprotected heights; and could understand, remember, and carry out simple instructions. In making this determination, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 67.)

In considering the symptoms, the ALJ followed the two-step process set out in the regulations, under which it must first be determined whether there is an underlying medically

---

seeking benefits can sustain doing despite their impairments. With the benefit of the RFC, the ALJ moves to step four, which requires the ALJ to deny benefits if a claimant with the described RFC is capable of performing his past relevant work. If not, the ALJ moves to step five, where he must decide whether there are a significant number of other jobs in the national economy that the claimant could perform, given his RFC, age, education, and work experience. Poole v. Kijakazi, 28 F.4th 792, 794 (7th Cir. 2022).

5

determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. (Tr. at 67-68.) Second, once such an impairment has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related abilities. (Tr. at 68.)

At the hearing, plaintiff testified that he tried to go back to work in 2022, but he could only work for a few days and could not handle his job duties. His past employment included work in asphalt maintenance. Since he stopped working, he had been living in the same house with his wife. When he went to doctor appointments, she generally drove him. He drove at times but had issues with sleep and reaction times. He stated that he wore Nitro patches and had taken cardiovascular medications that had been changed and increased to try to help his cardiac symptoms. He generally did not do chores around the house but could prepare some meals depending on how he felt. He stated that he generally did not talk to friends or family, and that he lived in a rural area. He took Nitro once or twice a day. He also had sleep issues, with anxiety every night, waking up and unable to go back to sleep. He was on multiple medications to help with sleep, but he continued to have issues and felt tired during the day. (Tr. at 68.)

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 68.)

The ALJ reviewed plaintiff's treatment records, which documented a history of coronary artery disease, with stent placement. (Tr. at 68, citing Tr. at 400.) An April 2021 stress test

6

calculated ejection fraction at 63%, and he had medication adjustments. (Tr. at 68, citing Tr. at 400.) At a visit later in April 2021, plaintiff reported sudden onset of chest pain after waking up, relieved by Nitro. He noted he had been placing a wheel bearing in his truck. (Tr. at 68, citing Tr. at 358.) He was restarted on ECP therapy and medications. (Tr. at 68, citing Tr. at 359-60.) At follow-up in October 2021, plaintiff complained of shortness of breath on exertion, as well as an aortic spasm with dizziness. (Tr. at 68, citing Tr. at 335.) He noted that his job changed from driving to physical labor, and he worked more than 70 hours a week. (Tr. at 68-69, citing Tr. at 335.) He reported side effects of nausea and fatigue with Losartan and felt better when he did not take the medication. (Tr. at 69, citing Tr. at 336.)

The ALJ saw no evidence of a significant increase in treatment corresponding to the November 15, 2021 alleged onset date. (Tr. at 69.) In December 2021, plaintiff presented to the emergency department for evaluation of right sided chest pain. He noted that he went for a walk the day before and had chest pain, and woke up in the middle of the night with shortness of breath, nausea, and other symptoms. (Tr. at 69, citing Tr. at 479.) The provider found acute coronary syndrome unlikely and recommended follow-up with his primary cardiologist to discuss other antianginals. (Tr. at 69, citing Tr. at 486.) Later in December 2021, plaintiff returned for follow-up when he reported feeling good with no hospitalization since the last visit; his anxiety was better controlled. He had shortness of breath when he got up, but this improved and went away. (Tr. at 69, citing Tr. at 315.) He was stable from a cardiac standpoint. (Tr. at 69, citing Tr. at 319.) Plaintiff's medications were adjusted in February 2022, when examination findings were generally normal other than distant soft S1 and S2 heart sounds. (Tr. at 69, citing Tr. at 811.) A March 2022 echocardiogram revealed left ventricular systolic function in low normal, ejection fraction estimated at 50%, and normal left ventricle size and

7

thickness. (Tr. at 69, citing Tr. at 814.) In April 2022, plaintiff returned for follow-up, denying chest pain, difficulty breathing, or other concerns. (Tr. at 69, citing Tr. at 404.) He did report anxiety, depression, and insomnia, for which he was receiving medical management. (Tr. at 69, citing Tr. at 741.)

In June 2022, plaintiff presented to urgent care with reports of chest pain after lifting boxes. His blood pressure was elevated, but a stress test showed no evidence of active ischemia, and ejection fraction was 58%. Chest x-ray was normal, and echocardiogram showed preserved ejection fraction of 55% with no significant valvular disease. Plaintiff was discharged home on Imdur. (Tr. at 69, citing Tr. at 715.) He returned for follow-up a few days later, reporting that he got short of breath if he tried to exert himself quickly, but otherwise he was able to walk two miles a day if he paced himself without any concerning symptoms. (Tr. at 69, citing Tr. at 716.) He reported headaches on Imdur, which was discontinued. (Tr. at 69, citing Tr. at 718.) Later in June 2022, plaintiff reported that his medication was working well. He reported that he could slowly work up to 2 miles but got short of breath after exerting himself 100 feet rapidly, and he had to pace himself to walk longer distances. (Tr. at 69, citing Tr. at 399.) He was generally assessed as stable and continued on medications. (Tr. at 69, citing Tr. at 402.)

In July 2022, plaintiff reported a return of anginal symptoms; he reported feeling well in the past on Prasugrel and wished to return to that medication. (Tr. at 69, citing Tr. at 714.) He was also to trial Diltiazem for coronary artery spasm. (Tr. at 69, citing Tr. at 714-15.) In October 2022, plaintiff denied any chest pain, difficulty breathing, or other concerns, and examination findings were generally normal. (Tr. at 69, citing Tr. at 390-91.) In April 2023, plaintiff reported that he was not feeling well with nausea, increased anxiety, and not sleeping well. (Tr. at 69,

8

citing Tr. at 376, 705.) Later in April 2023, plaintiff noted that he was traveling recently for work, came home, and discovered he was taking the wrong dose of Metoprolol. He reported feeling chest pain when working in his garage and bending forward. (Tr. at 69, citing Tr. at 702.) He was having symptoms on a lower dose of medication. (Tr. at 69, citing Tr. at 703-04.) Later in April 2023, plaintiff reported that he was using his Nitro three to four times in a month's time and was having frequent spasms in the chest area, and his medications were adjusted. (Tr. at 69-70, citing Tr. at 371-75.) He also reported symptoms of anxiety in April 2023, and his medications were adjusted. (Tr. at 70, citing Tr. at 873-75.)

In June 2023, plaintiff was treated at the emergency department for chest pain. He reported that he was mowing the lawn and his symptoms became so severe that he came to the emergency department for further evaluation. (Tr. at 70, citing Tr. at 436.) He had elevated blood pressure at 171/100 but otherwise normal examination findings. (Tr. at 70, citing Tr. at 442.) Laboratory tests were unremarkable, and chest x-ray did not show any acute findings. (Tr. at 70, citing Tr. at 443.) Admission for stress test was recommended, and the test was negative for any acute myocardial infarction. (Tr. at 70, citing Tr. at 442, 450.) His condition improved, and he was discharged home medically stable. He was restarted on Ranexa due to his significant history of coronary artery disease. (Tr. at 70, citing Tr. at 450.)

At follow-up visits in July through September 2023, plaintiff had some continued symptoms but was exercising at least 10 miles a day between walking and biking. (Tr. at 70, citing Tr. at 829-57.)[3] In September 2023, plaintiff reported memory and attention issues. (Tr at 70, citing Tr. at 1116.) Mini mental status examination was performed, and he was started

---

[3]The reference to walking and biking is found on page 834.

9

on a small dose of Wellbutrin. (Tr. at 70, citing Tr. at 1118.) At an annual examination in October 2023, examination findings were generally normal, and a CT of the chest was unremarkable. (Tr. at 70, citing Tr. at 1110-15, 1128-30.)

In January 2024, plaintiff presented to the emergency department with reports of chest pain. Troponin levels were normal, echocardiogram showed normal findings with ejection fraction of 61%, and stress test was negative for evidence of myocardial ischemia or infarction. Plaintiff was discharged home, and at follow-up he reported feeling a lot better with no new concerns. (Tr. at 70, citing Tr. at 1145.) Plaintiff also received treatment for shortness of breath in January 2024, when it was noted that he had viral illness and felt more fatigued than normal. (Tr. at 70, citing Tr. at 1549.) At a follow-up in February 2024, his symptoms had improved. (Tr. at 70, citing Tr. at 1620.) In February 2024, his cardiac symptoms were at baseline with some shortness of breath on exertion. (Tr. at 70, citing Tr. at 1575.) At follow-up in July 2024, plaintiff reported shortness of breath on exertion occasionally and some other symptoms. (Tr. at 70 citing Tr. at 1584.)

In August 2024, plaintiff presented to the emergency department with reports of chest pain after walking around Walmart. He reported that he took Brilinta and aspirin daily and had not missed any doses. (Tr. at 70, citing Tr. at 1528.) Plaintiff underwent myocardial perfusion stress test without concerning findings. (Tr. at 70, citing Tr. at 1544.) Medications were prescribed to help with insomnia, and his cardiac medications were adjusted. (Tr. at 70, citing Tr. at 1544, 1609.) His medications were again adjusted at follow-up later in August 2024. (Tr. at 70, citing Tr. at 1595.)

The ALJ concluded that plaintiff's alleged symptoms were not consistent with and supported by the evidence of record. While plaintiff had some limitations, the treatment record

10

reflected a wide range of daily activities. Medical records noted work activity as much as 70 hours a week in 2022 and traveling for work in 2023. (Tr. at 70, citing Tr. at 882, 702.)[4] However, plaintiff denied working more than a few days since the alleged onset date, and earning records did not reflect significant work activity since the alleged onset date. (Tr. at 70-71.) Treatment records also indicated that plaintiff experienced chest pain when he exerted himself or was in the heat (Tr. at 1572-76), that he went on a road trip (Tr. at 1593), spent time at a friend's house (Tr. at 1593), shopped at Walmart (Tr. at 1528), mowed his lawn (Tr at 436), and exercised up to 2 to 10 miles slowly (Tr. at 399, 829-57). Plaintiff primarily received treatment for cardiac impairments, which the ALJ accommodated with a limitation to light exertional work with additional postural and environmental limitations. To the extent plaintiff alleged additional limitations, testing since the alleged onset date had been generally normal with ejection fraction of 50 to 61% and stress tests showed no evidence of active ischemia. (Tr. at 71, citing Tr. at 1583, 957, 1098, 557.)

Plaintiff also testified to sleep difficulties, and the treatment records did indicate that he received medication for insomnia, with reported memory and concentration issues. (Tr. at 71, citing Tr. at 1116.) At times, plaintiff reported that he was sleeping well on medication. (Tr. at 71, citing Tr. at 1633.) Nevertheless, the ALJ limited his exposure to hazards and included other environmental limitations due to his sleep issues and possible side effects from medications. Plaintiff had received medication management for depression and anxiety, but psychiatric findings were consistently normal, with appropriate behavior, mood and affect, and

---

[4]The ALJ cited Ex. 8F/64 for the proposition that plaintiff reported working 70+ hours per week in 2022, but this reference is found on the previous page, Ex. 8F/63, page 881 of the transcript.

11

normal judgment and insight. (Tr. at 71, citing 527, 609, 621, 634, 893, 899, 904, 910, 916, 923, 929, 937, 943, 955, 956, 963, 969, 982, 989, 997, 1013, 1021, 1027, 1036, 1044, 1053, 1199, 1213, 1252, 1259, 1266, 1531, 1566, 1576, 1584, 1593.) Therefore, the ALJ concluded that the record demonstrated plaintiff could understand, remember, and carry out simple instructions. (Tr. at 71.)

The ALJ then turned to the medical opinion evidence, noting that under the regulations he could not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion, including those from treating sources. The ALJ stated:

> I have fully considered the medical opinions and prior administrative medical findings as follows: DDS physician opinions limiting the claimant to light exertional work with postural and environmental limitations (Exhibit 1A; 3A) is generally persuasive and consistent with the residual functional capacity assessment as they are findings of disability reviewers who have supported their opinions with evidence of record.

(Tr. at 71, citing Tr. at 42-47, 49-58.)

The ALJ noted that plaintiff's providers made various statements on disability that were not generally persuasive. For instance, in April 2011, one of plaintiff's providers opined that plaintiff was calculated to have permanent partial disability of 75% of the hand. (Tr. at 71, citing Tr. at 286.) However, this opinion was given 10 years prior to the alleged onset date, and plaintiff was able to work for many years after the opinion was given. Plaintiff also qualified for permanent disabled parking, but this was not a function-by-function finding on disability. (Tr. at 71, citing Tr. at 192.) In February 2024, plaintiff was released from the hospital with restrictions of no lifting more than 10 pounds with the right arm for three to five days, but this was not a permanent or long term restriction and therefore was not included in the RFC assessment. (Tr. at 71, citing Tr. at 1199.)

12

The ALJ concluded:

Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the medical findings, nature and frequency of treatment, the claimant's activities, opinion evidence and other factors discussed above. I have accommodated the claimant's impairments by limiting him to a range of light exertional work set forth above. To the extent the claimant alleges greater limitations, the alleged symptoms are not consistent with and supported by the evidence of record.

(Tr. at 71-72.)

At step four, the ALJ determined that plaintiff could not perform his past relevant work. (Tr. at 72.) At step five, however, the ALJ determined that plaintiff could do other jobs, as identified by the VE, including sales attendant, counter attendant, and cashier II. (Tr. at 72-73.) The ALJ accordingly found plaintiff not disabled and denied his application. (Tr. at 73.)

On June 25, 2025, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. at 1.) This action followed.

## II. DISCUSSION

### A. Standard of Review

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by "substantial evidence." Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Failure to apply the correct legal standard requires remand, unless the error is harmless. Karr, 989 F.3d at 513.

Factual findings must be supported by "substantial evidence," which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Biestek v. Berryhill, 587 U.S. 97, 103 (2019). The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case

13

accordingly. See Richardson v. Perales, 402 U.S. 389, 399-400 (1971). The reviewing court will not re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination so long as substantial evidence supports it. Lincoln v. Bisignano, 173 F.4th 886, 891 (7th Cir. 2026). Even if reasonable minds could differ concerning whether the claimant is disabled, the court must nevertheless affirm the ALJ's decision if adequately supported. Jarnutowski v. Kijakazi, 48 F.4th 769, 773 (7th Cir. 2022).

This does not mean the court simply rubber-stamps the ALJ's decision. Padua v. Bisignano, 145 F.4th 784, 789 (7th Cir. 2025). The ALJ must build an accurate and logical bridge from the evidence to his conclusion. Id. But this articulation requirement is minimal; an "ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." Warnell v. O'Malley, 97 F.4th 1050, 1053 (7th Cir. 2024). All that is required is that the ALJ provide an explanation for how the evidence leads to his conclusions that is sufficient to allow the reviewing court to assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. Id. at 1054. And on appeal, it is not enough for the claimant to criticize the ALJ's decision about his functional capacity to work; he must point to evidence compelling the conclusion that the adverse disability decision lacks substantial support in the record. Morales v. O'Malley, 103 F.4th 469, 470 (7th Cir. 2024).

**B.      Plaintiff's Claims**

### 1.      Agency Medical Consultants' Opinions

The regulations require an ALJ to consider all medical opinions in the case record. 20 C.F.R. § 404.1520c(b). The ALJ need not defer or give any specific evidentiary weight,

14

including controlling weight, to any medical opinion, including those from the claimant's treating providers. Id. § 404.1520c(a). Rather, the ALJ must articulate how "persuasive" he finds the opinions. Id. § 404.1520c(b). The factors of "supportability" and "consistency" are the most important in determining how persuasive an opinion is; therefore, the ALJ must explain how he considered these two factors. Id. § 404.1520c(b)(2). Under the supportability factor, the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(1). Under the consistency factor, the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(2); see also Bakke v. Kijakazi, 62 F.4th 1061, 1068 (7th Cir. 2023) (noting that § 404.1520c requires an ALJ to consider the internal supportability of a physician's medical opinion and whether the medical opinion is consistent with the record as a whole). The ALJ may, but is not required to, explain how he considered the other regulatory factors: the source's relationship with the claimant, the source's specialization, and the source's familiarity with the other evidence in the record or an understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(5).

As indicated above, in the present case, the ALJ stated:

I have fully considered the medical opinions and prior administrative medical findings as follows: DDS physician opinions limiting the claimant to light exertional work with postural and environmental limitations (Exhibit 1A; 3A) is generally persuasive and consistent with the residual functional capacity assessment as they are findings of disability reviewers who have supported their

15

opinions with evidence of record.

(Tr. at 71.)

This is insufficient. Merely stating that the consultants supported their opinions with evidence, without discussing the relevance of that evidence or explaining how it bolsters the opinions, does not adequately address the "supportability" factor. And the "consistency" factor requires an evaluation of how consistent the opinion is with the other evidence of record, not with the ALJ's previously determined RFC. Finally, to the extent the ALJ's comment that the consultants are "disability reviewers" was meant to imply they understand the disability program's policies and evidentiary requirements, reference to this ancillary factor cannot compensate for failure to address the two primary factors. See Liapis, 2026 U.S. App. LEXIS 19667, at *9 (finding ALJ erred by discussing the discretionary factors but failing to explain how he considered the supportability and consistency factors).

> So the administrative law judge's opinion is vulnerable. But that is nothing new. See Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985). No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.

Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989).

Failure to comply with § 404.1520c, like other legal errors, can be harmless. See Reham T., 2026 U.S. Dist. LEXIS 69446, at *12; Thomas v. Kijakazi, No. 21-cv-1385-pp, 2023 U.S. Dist. LEXIS 143107, at * 54 (E.D. Wis. Aug. 16, 2023). The ALJ's error was harmless here.

The nature of this error must be placed in context. RFC is an issue for the ALJ alone—not any doctor—to decide. Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014). In determining RFC, the ALJ considers the entire record; he is not required to rely entirely on a particular physician's opinion or choose between the various opinions in the record. See Pufahl

16

v. Bisignano, 142 F.4th 446, 458 n.18 (7th Cir. 2025) (citing Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).

In the present case, the ALJ considered the entire record, including plaintiff's medical history, effectiveness of treatment, reports of daily activities, effects of symptoms, medical source statements, and work attempts. See SSR 96-8p, 1996 SSR LEXIS 5, at *13-14 (listing evidence the ALJ should consider in determining RFC). After considering this evidence, the ALJ fashioned an RFC more restrictive than the agency medical consultants recommended.[5] In other words, the ALJ's insufficient evaluation of the consultants' opinions did not cause him to omit additional limitations those consultants endorsed. Nor is this a case where the ALJ adopted the agency consultants' views over the more restrictive opinion(s) from the claimant's treating provider(s).[6] See Best v. Berryhill, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004)). Finally, plaintiff develops no argument that the ALJ's § 404.1520c error created an evidentiary gap in the RFC determination. See Archibald v. Bisignano, No. 25-C-1170, 2026 U.S. Dist. LEXIS 98778, at *35 (E.D. Wis. May 5, 2026) (noting that an ALJ's decision to

---

[5]Specifically, the ALJ included additional postural limitations not recommended by the consultants. (See Tr. at 46, 55, 67.) The inclusion of these limitations "shows that the ALJ considered the entire record and did not blindly rely on the earlier agency assessments." Sauer v. Saul, No. 19-C-927, 2020 U.S. Dist. LEXIS 108750, at *39 (E.D. Wis. June 19, 2020).

[6]As the ALJ noted, one of plaintiff's providers offered an opinion in April 2011 assessing permanent partial disability of the hand, but this opinion had no bearing on plaintiff's ability to work, despite his heart condition, in 2021-2022. (Tr. at 71, 285-86.) Similarly, a temporary lifting restriction imposed by a provider in February 2024, long after the DLI, did not support limitations during the relevant period. (Tr. at 71, 1199.) Plaintiff does not allege error in the ALJ's evaluation of these records.

17

discount all medical opinion evidence in the record can create an "evidentiary gap," but that reversible error will occur only when the ALJ, after rejecting the opinion evidence, crafts an RFC determination untethered to any record evidence); see also SSR 96-8p, 1996 SSR LEXIS 5, at *19 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).").

Plaintiff notes that the consultants' findings were the only opinions the ALJ deemed persuasive. (Pl.'s Br. at 12.) But plaintiff identifies no other relevant opinions the ALJ discounted in favor of the consultants' views. In reply, plaintiff contends that the consultants' opinions "influenced" the RFC finding (Pl.'s Rep. Br. at 2-3), but he provides no reason to believe that remand to say more about the supportability and consistency of these opinions would lead to a different RFC.[7] See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013)

---

[7]Plaintiff cites Goecks v. Kijakazi, No. 21-CV-01107-SCD, 2023 U.S. Dist. LEXIS 16635 at *14-15 (E.D. Wis. Feb. 1, 2023), but that case shows why the § 404.1520c error is harmless in the present case. In Goecks, the ALJ found a consultant's opinion generally persuasive but declined to adopt one of the specific limitations the consultant recommended. Id. at *13-14. The court found legal error because the ALJ failed to address the consistency of the consultant's opinion with the other evidence. Id. at *14. The court further concluded the error was not harmless because proper consideration of the opinion could have led to a more restrictive RFC, which could then impact the ALJ's assessment of available jobs at step five, which would ultimately affect the claimant's disability status. Id. at *15. As discussed above, in the present case, the ALJ included all of the limitations the consultants recommended; the ALJ's flawed evaluation of those opinions did not cause him to omit additional limitations the consultants suggested. Plaintiff acknowledges that the ALJ included all of the consultants' recommendations (plus additional postural limitations) in the RFC but argues the consultants' opinions influenced the finding of a light exertional ability. (Pl.'s Rep. Br. at 2.) However, plaintiff fails to explain how remand for further discussion of the regulatory factors might lead the ALJ to adopt a sedentary RFC; he does not, for instance, cite any record evidence the ALJ discounted or overlooked supporting a sedentary finding. Nor does he acknowledge the VE's testimony identifying sedentary jobs a person with all the other limitations in the RFC could do. (Tr. at 1674-75.)

18

("[W]e will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."). Put another way, plaintiff fails to show that he was prejudiced by the ALJ's failure to articulate his findings under the regulation. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("This Court has said that the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.") (internal quote marks omitted). Nor does plaintiff cite any medical evidence the ALJ overlooked or erroneously evaluated compelling a different RFC, as he must to obtain remand. See Morales, 103 F.4th at 470 ("[The claimant] must point to evidence compelling the conclusion that the adverse disability decision lacks substantial support in the record.").

### 2. Daily Activities

In determining whether a claimant is disabled, the ALJ must consider all of the claimant's symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9.

At the second step, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record, considering the objective medical evidence; the claimant's daily activities; factors that precipitate and aggravate the symptoms;

19

the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the claimant receives or has received for relief of the symptoms; and any measures other than treatment the claimant uses or has used to relieve the symptoms. Id. at *11, 18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. On appeal, the court will overturn the ALJ's evaluation of a claimant's subjective symptoms only if it is "patently wrong," which means that the decision lacks any explanation or support. Pufahl, 142 F.4th at 458.

As indicated above, the ALJ followed the two-step process here. In the course of making his step two finding, the ALJ noted various activities, including references to plaintiff working 70 hours per week in 2022, taking a road trip, spending time at a friend's house, shopping at Walmart, mowing his lawn, and exercising. While the ALJ did not make the common mistake of equating these activities with the demands of full-time work, see Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) (noting the critical differences between activities of daily living and activities in a full-time job), he never specifically explained how they undermined plaintiff's claims about the severity and limiting effects of his symptoms. See Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017) ("[T]he ALJ did not explain why doing these household chores was inconsistent with Cullinan's description of her pain and limited mobility. Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that Cullinan's daily activities reveal any exaggeration of Cullinan's limitations."); Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009) ("Although [the ALJ] briefly described Villano's testimony about her daily activities,

20

he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed.").[8]

Plaintiff also challenges the significance of these references. For instance, he states that the February 2022 notation that he worked 70 hours per week appears to have been copied and pasted from a 2021 (pre-DLI) note, and the ALJ should not have relied on this vestigial reference in making his finding.[9] (Pl.'s Br. at 13-14.) As for the road trip, the ALJ never said what plaintiff <u>did</u> on the trip that contradicted his allegations. (Pl.'s Br. at 15, citing <u>Murphy v. Colvin</u>, 759 F.3d 811, 817 (7th Cir. 2014) ("Given the limited information available on the record, such a vacation as described by Murphy would not be inconsistent with her symptoms to the point where her credibility would be diminished.").) Plaintiff spent time with a friend, but that is not inconsistent with disabling symptoms. (Pl.'s Br. at 16, citing <u>Mason v. Barnhart</u>, 325

---

[8]The Commissioner responds that the court may not re-weigh this evidence. (Def.'s Br. at 8-9.) However, this assumes the ALJ weighed it in the first instance. <u>See</u> <u>Alexander ex rel. M.A. v. Colvin</u>, No. 13 C 4620, 2015 U.S. Dist. LEXIS 30290, at *23 (N.D. Ill. Mar. 12, 2015) (noting that merely summarizing evidence is not the same as weighing it or providing reasons to support that weight).

[9]Plaintiff contends the ALJ misapprehended when he stopped working (Pl.'s 17), but read as a whole the decision refutes that contention. <u>See</u> <u>Rice</u>, 384 F.3d at 370 n.5 ("[I]t is proper to read the ALJ's decision as a whole[.]"). The ALJ found at step one that plaintiff did not engage in substantial gainful activity during the relevant period. (Tr. at 65.) Later, in the RFC discussion, immediately after his citation of the treatment notes suggesting work in 2022 and 2023, the ALJ noted plaintiff's denial that he worked for more than a few days after the alleged onset date; the ALJ also cited the earnings records, which did not reflect significant work activity after the alleged onset date. (Tr. at 70-71; <u>see also</u> Tr. at 1658, ALJ questioning plaintiff about this issue at the hearing.) As the Commissioner notes in response, it appears the ALJ did not hold the work activity references against plaintiff in any tangible way. Had the ALJ truly believed plaintiff was working 70+ hours per week in 2022, he would have discussed the issue at step one. (Def.'s Br. at 10-11.) Plaintiff replies that the ALJ must have considered this work activity, as it was the first item of evidence he cited in making his credibility finding. (Pl.'s Rep. Br. at 4-5.) However, plaintiff fails to address the significance of the ALJ's step one determination. In any event, for the reasons discussed in the following text, any error in relying on plaintiff's alleged work activity or other activities was harmless.

21

F. Supp. 2d 885, 904 (E.D. Wis. 2004) ("One can be disabled and yet get together with friends from time to time.").) And the record shows that plaintiff experienced onset of symptoms when he shopped at Walmart and tried to mow the lawn, so these activities would appear to provide no support for the ALJ's finding. (Pl.'s Br. at 17.)

Again, however, flaws of this sort may be harmless. So long as the ALJ provides other reasons supported by the record, improper reliance on daily activities does not require remand. See, e.g., Rennaker v. Saul, 820 Fed. Appx. 474, 480 (7th Cir. 2020) ("[T]he ALJ's mistake was harmless because the ALJ did not rely on Rennaker's daily activities to the exclusion of other evidence; nor did he equate these activities with competitive work."); Richards v. Berryhill, 743 Fed. Appx. 26, 29 (7th Cir. 2018) ("The ALJ's consideration of Richards's activities of daily living is shaky, but he sufficiently supported the credibility determination with other 'specific reasons supported by the record.'") (quoting Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013)); Stenholtz v. Saul, No. 20-cv-1254, 2021 U.S. Dist. LEXIS 215271, at *70 (E.D. Wis. Nov. 8, 2021) ("The ALJ likely should have said more about plaintiff's limitations in what were already rather limited activities. But any error was harmless, as the ALJ cited several other factors in determining RFC."); see also Halsell, 357 Fed. Appx. at 722-23 ("Not all of the ALJ's reasons must be valid as long as enough of them are[.]").

As summarized above, the ALJ cited other substantial evidence in support of his finding, including the objective medical evidence (e.g., ejection fraction at 50% or above,[10] normal chest x-rays, unremarkable laboratory tests, negative stress tests, generally normal examination

---

[10]Ejection fraction is the percentage of blood the heart's lower left chamber (left ventricle) pumps out, or ejects, with each beat. A normal ejection fraction is 50% to 70%. https://my.clevelandclinic.org/health/articles/16950-ejection-fraction (last visited July 20, 2026).

22

findings), the effectiveness of medications, and the absence of a significant increase in treatment corresponding to the alleged onset date. Importantly, the ALJ accepted that plaintiff experienced cardiac symptoms, which he accommodated with a limitation to light work with additional postural and environmental limitations. The ALJ also accepted that plaintiff experienced symptoms related to insomnia, which he accommodated by limiting exposure to hazards. As indicated above, the ALJ adopted an RFC "more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence [plaintiff] presented." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019); see also Green v. Saul, 781 Fed. Appx. 522, 527 (7th Cir. 2019) (affirming where the ALJ used what he heard from the claimant "to tailor an RFC that fit her limitations, though not necessarily the intensity to which she testified").

Plaintiff challenges none of these other findings. Nor does he allege the ALJ overlooked other favorable evidence in making these findings. Accordingly, any error in relying on daily activities was harmless.[11] See Tutwiler v. Kijakazi, 87 F.4th 853, 859 (7th Cir. 2023) ("Although the ALJ might have erred in his analysis of some factors, enough of them had adequate supporting evidence for this court to uphold his credibility determination."); Schrank v. Saul, 843 Fed. Appx. 786, 789 (7th Cir. 2021) ("Even if the ALJ's other reason for discounting Schrank's testimony . . . was not substantiated by the record, we would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding[.]"); Bates

---

[11]The Commissioner notes that most of the activities plaintiff discusses occurred long after the date last insured, such that they had no impact on the outcome of the case. (Def.'s Br. at 9.) Plaintiff replies that, if post-DLI activities are irrelevant, the ALJ erred in using them to discount plaintiff's statements. (Pl.'s Rep. Br. at 4.) I need not resolve this dispute, as any error in relying on plaintiff's activities was harmless.

23

<u>v. Colvin</u>, 736 F.3d 1093, 1098 (7th Cir. 2013) (upholding ALJ's credibility determination despite disagreeing with some underlying reasons); <u>McKinzey</u>, 641 F.3d at 890-91(affirming despite seeing merit in two out of three challenges, where the claimant did not challenge the third reason for the credibility finding).

## III. CONCLUSION

The ALJ should have articulated how he considered the supportability and consistency factors in assessing the agency consultants' opinions. He also should have explained how the daily activities he cited undermined plaintiff's statements. But there is no reason to believe remand for a more fulsome discussion of this evidence would lead to a different result. The ALJ cited substantial evidence supporting his conclusion that plaintiff remained able to work, including the relatively benign objective test results, generally normal examination findings, effectiveness of medications, and consistency of treatment before and after the alleged onset date. The record contains no medical opinion supporting greater limitations during the relevant period than found by the ALJ, and plaintiff points to no other medical evidence that compels a different RFC. <u>See</u> <u>Morales</u>, 103 F.4th at 471 ("Nowhere does [plaintiff] identify what evidence the ALJ overlooked or discounted, nor does [he] explain how the RFC determination should have been different.").

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 21st day of July, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

24